# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| KRYSTAL BRAKEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-01344-JEO |
| | ) | |
| BBVA COMPASS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, Krystal Brakeman ("Plaintiff") claims that her former employer, BBVA Compass ("Compass"), denied her a promotion and discharged her in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 et seq.; and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. (Doc.[1] 1 ("Complaint" or "Compl.").  The cause now comes to be

---

[1] References herein to "Doc(s). ___" are to the document number(s) of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk. Pinpoint citations to pleadings, declarations, and affidavits are to paragraph number, while cites to deposition testimony are to the page of the reporter's transcript.  Unless otherwise noted, pinpoint cites are to the page of the electronically-filed document in the court's CM/ECF system, which may not correspond to pagination on the original "hard copy" of the document presented for filing.

heard on Compass's motion for summary judgment. (Doc. 17). Upon consideration, the court[2] concludes that the motion is due to be granted.

## I.   SUMMARY JUDGMENT REVIEW STANDARDS

Pursuant to Rule 56, Fed. R. Civ. P., a party may move for summary judgment claims asserted against it. Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has met that burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not

---

[2] The action is assigned to the undersigned pursuant to 28 U.S.C. § 636 and this court's general order of reference dated January 2, 2015. The parties have since consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Rule 73, Fed. R. Civ. P. (Doc. 7).

establish the absence or presence of a genuine dispute, or that an adverse party

cannot produce admissible evidence to support the fact."  Rule 56(c)(1)(A), (B),

Fed. R. Civ. P.  In its review of the record, a court must credit the evidence of the

non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart*

*v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary

judgment, "the judge's function is not himself to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    BACKGROUND[3]

Compass is an international banking and financial institution.  It hired

Plaintiff in January 2011, whereupon she began working as a "Collector II" at

Compass's Call Center in Decatur, Alabama.  Her direct supervisor was Lisa

Sharp, a "Client Service Manager II."  After Sharp retired on July 1, 2015,

Summer Hastings was promoted to replace her, thereby becoming Plaintiff's

supervisor.  Hastings reported to Senior Vice President Keith Alderson, who, in

turn, reported to Senior Vice President and Director of Collections Michael Frye.

Plaintiff's claims in this case are based on two adverse employment actions.

First, she contends that, in June 2015, she was passed over for a promotion to

---

[3] The factual summary recited in this section is gleaned from the evidence submitted on the motion for summary judgment.  Consistent with the applicable standard of review, it sets forth the facts in the light most favorable to the non-movant.  As such, these are the facts for purposes of the motion only and may not represent the actual facts of the case.  *See Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

"Collections Client Service Advisor III," which the parties and many of the witnesses colloquially refer to as a "Team Lead" position. Compass ultimately awarded that job to another Compass employee, LaTasha Clemons. Second, Plaintiff challenges her termination, which occurred on September 14, 2015. In short, Plaintiff's theory is that Hastings played a role in both adverse actions, at least as a "cat's paw" that influenced the decisions formally made by others. Specifically, Plaintiff posits that Hastings harbored animus against her because she, Plaintiff, had depression, anxiety and panic attacks that rendered her disabled for purposes of the ADA and caused her to miss work on intermittent FMLA leave. Plaintiff claims that Hastings also resented her for complaining in July 2015 that a co-employee, Susan Talmadge, had made remarks that Plaintiff, who is in a same-sex marriage, took as harassment based on religion and her sexual orientation. The court further outlines below the evidence underlying Plaintiff's claims, starting with the promotion she did not receive.

## A.     The "Team Lead" Vacancy

Compass internally posted that it was seeking applicants for the Team Lead opening on June 10, 2015. The person to be selected would report to the Client Service Manager II, which was then still occupied by Sharp. It was understood, though, that Sharp would be retiring and that the new Team Lead would thus be reporting to Hastings as Sharp's successor. (Doc. 19-8 at 2-16 ("Hastings Dep."))

at 12-13).   Indeed, when Clemons submitted an application for the vacancy on June 18, 2015, the internal recruiter in Compass's Human Resources ("HR") Department, "Talent Partner" Melissa Edwards, sent an email not to Sharp but, rather, to Hastings asking her to review Clemons's attached resume and "provide feedback" to HR.  (Doc. 21-4 at 3-4; Hastings Dep. at 12-13; Doc. 19-1 at 2-35 ("Edwards Dep.") at 30-32, 34-37).

It is also clear, however, that Sharp was intimately involved in selection process for the Team Lead.  To wit, after Hastings received the aforementioned email from Edwards, she forwarded it without comment to Sharp, who then scheduled Clemons for an interview at 1:30 p.m. on Friday, June 26, 2015.  (*See* Doc. 21-5).  That interview was originally to be conducted jointly by Sharp; Hastings; and another Collections Department manager, Maurice Greer.  (*Id.*) Because Hastings was going to be out of the office on June 26th, she asked that the interview be reset.  That request was denied, however, so the interview proceeded without her.  Nonetheless, in anticipation of the interview, Hastings and Sharp discussed Clemons's "performance and leadership skills," and they were "in agreement that [Clemons] would make a good candidate for [the position]." (Hastings Dep. at 16).  Hastings denies having discussed any other potential candidates with Sharp.

At 4:04 p.m. on June 26th, Sharp sent an email to Edwards stating: "We have interviewed Latasha Clemons and would like to extend the offer to her." (Doc. 21-4 at 3; *see also* Edwards Dep. at 39, 56). Two minutes later, Edwards sent a reply to Sharp stating, "Hey, I sent the email for Summer to offer Latasha the position[. L]et me know if you have any questions[.] Summer is off today." (Doc. 21-4 at 6). Then, at 4:12 p.m., Edwards sent another reply to Sharp, copied to Hastings and Keith Alderson advising, "I will extend the offer to Latasha Clemons." (*Id*. at 2-3). Clemons ultimately accepted that offer and assumed the Team Lead position.

When the above emails were exchanged on the afternoon of June 26th, Plaintiff had not submitted an application for the Team Lead vacancy. Rather, it was not until the next morning, Saturday, June 27th, that Plaintiff applied. Specifically, Compass's online applicant tracking system shows, and Plaintiff does not contest, that her first attempt to submit an application was at 8:34 a.m. on June 27th, but it was rejected as "incomplete," whereupon she resubmitted another at 9:55 a.m. that was accepted. (*See* Doc. 19-1 at 58; Pl. Dep. at 167-68).

For her part, Hastings denies involvement in the decision to fill the Team Lead vacancy other than by forwarding Edwards's email to Sharp and by favorably opining generally on Clemons's candidacy in her discussion with Sharp before Clemons's interview. Plaintiff testified in her deposition, however, that that, while

she was "actually filling out the application," Hastings came to her and said: "I know you're applying. You're more than qualified for the position. However, due to your medical, I need one that is --- can be here to work all the time, and you have medical and you have to miss days." (Pl. Dep. at 114). At another point, Plaintiff characterized that exchange this way: "Whenever I applied for the new job position, [Hastings] told me that I was more than – more than qualified to perform the new position's responsibilities, but, unfortunately, due to my medical condition, she would have to choose another – another person." (*Id.* at 157; *see also id.* at 168-69 (wherein Plaintiff testified: "Right after I applied for the position, …. [Hastings] said I was more than qualified but they were selecting someone else"); *id.* at 170 ("[Hastings told] me that I was more than qualified, but due to my medical and having to take time off from time to time for doctor's appointments and things, she needed someone that could be there all the time.")[4].

### B. Susan Talmadge's Comments

Over the course of "two or three days" in July 2015, a co-worker in Plaintiff's area, Susan Talmadge, made several remarks to Plaintiff and in her presence to the effect that Talmadge and other employees "need[ed] to talk to [Plaintiff] about Jesus" and "about getting a man in her life." (Pl. Dep. 208-09,

---

[4] Compass mentions several times in its briefs that Hastings denies that she had any such conversation with Plaintiff. Of course, at summary judgment, such denials are inconsequential; the court must generally credit the Plaintiff's testimony and view the evidence in the light most favorable to her.

210).  Plaintiff, who is married to a woman, was offended, taking the comments as harassment based on religion and her sexual orientation.  When asked how many times she heard Talmadge make the comments, Plaintiff couldn't recall and that she was "unsure" whether it was more than five.  (*Id.* at 210).

On July 15th, Plaintiff approached Greer and complained about what Talmadge had said.  (*See* Docs. 21-9, 21-10; Pl. Dep. at 171, 208-09, 212, 221).  Greer responded by contacting his supervisor, Alderson, who, in turn, consulted with Edwards in HR.  (*See* Doc. 21-10 at 3; Edwards Dep. at 42-49).  The next day, July 16th, with Alderson present, Greer verbally counseled Talmadge on Compass's policy of "diversity and inclusion,"[5] cautioning her to keep her workplace discussions "professional and respectful."  (Doc. 21-10 at 3).  Plaintiff acknowledges that, after she complained to Greer, she experienced no further problems with Talmadge.  (Pl. Dep. at 213).  Although Hastings was on vacation when this episode occurred, she was notified of it upon her return.  (Hastings Dep. at 23-24).

## C.    Plaintiff's Termination

Plaintiff's termination occurred on September 14, 2015.  However, the events leading up to it began about a month earlier.  According to Plaintiff, in mid-

---

[5] Compass's Code of Conduct handbook includes a provision stating that "[n]o employee shall by words or actions harass or discriminate against any other employee" based on a host of enumerated characteristics that include both "religion" and "sexual orientation."  (Docs. 21-14, 21-15 ("Code of Conduct") § 5.38).

August 2015, a rumor began going around that Amanda Mitchell, a supervisor in another area, had an arrest mugshot on the internet. On or about August 15th, an employee under Mitchell's supervision named Chasity Terry told Plaintiff about the mugshot and pulled it up on her phone and showed it to her. Plaintiff recognized the person in the photo as Mitchell, but saw the listed name was "Amanda Darlene Findley." The site further indicated that the photo was from an arrest on December 26, 2009, in Baldwin County, Alabama, on a charge of negotiating a worthless instrument. (*See* Doc. 21-13).

Later that day, Plaintiff went to Hastings, and Plaintiff used her phone to show Hastings the mugshot of Mitchell. According to Plaintiff, she told Hastings that she had heard some other agents talking about the online mugshot and that she believed this was it. Plaintiff also said she was "kind of freaking out" because she was wondering whether she and Mitchell might be distantly related, because Plaintiff was originally from the county adjacent to where Mitchell was arrested and Plaintiff's aunt appears to have also had the maiden name "Findley." (Pl. Dep. at 176). Finally, Plaintiff says that she also reported to Hastings that she, Plaintiff, had overheard other agents by her door saying that, if Mitchell "made them mad one more time, they're going to show" the photo. (*Id.* at 176-77). At the conclusion of their conversation, Hastings told Plaintiff that she would "take care of" the situation. (*Id.* at 176).

Although Plaintiff says that she reported to Hastings that she, Plaintiff, had overheard *other agents* grousing about Mitchell suggesting that *they* would publicize the mugshot if Mitchell were to displease *them*, Hastings testified that she took Plaintiff's report to be itself "a form of harassment, of blackmail," against Mitchell by *Plaintiff herself*. (Hastings Dep. at 27-28; *see also id.* at 29-30, 32-33). In that vein, Hastings explains that, although Mitchell did not supervise Plaintiff, some agents in Hastings's group, including Plaintiff, had been "assisting" on another collections "product" that Mitchell did manage. (*Id*. at 28). In connection with that, Hastings says, Mitchell was "grading usually like one quality call on each agent for each month." (*Id.*; *see also id.* at 53-54). As such, Hastings says she took some of Plaintiff's remarks as indicating that she was going to "use [the mugshot] to get [Mitchell's] job" if she "made one more bad remark about [Plaintiff's] quality or comment or sent another coaching e-mail." (*Id*. at 29).

On August 18th, Hastings followed up by asking Plaintiff to send a text message with a link to the webpage with Mitchell's mugshot. Plaintiff complied. (Pl. Dep. at 177; Doc. 21-12). That same day, Hastings called the director of the collections department, Frye, and told him about Plaintiff's report of Mitchell's mugshot and that Hastings believed Plaintiff was harassing and might potentially blackmail Mitchell. (Hastings Dep. at 29-30, 32). Frye instructed Hastings to contact HR. On August 19th, Hastings spoke by phone with Edwards, at which

time Hastings again related her view that Plaintiff had indicated she was going to use the mugshot against Mitchell. (*Id.* at 31). Specifically, Hastings says that she told Edwards "that [Plaintiff] had found that mug shot and [Plaintiff] had advised that a few agents – it was going around the office and that if her quality issue was still a concern and they were sending coaching emails, that [Plaintiff] was going to use it against [Mitchell]." (*Id.*) Also on August 19th, Hastings sent an email to Edwards; Alderson; Frye; and Mitchell's supervisor, Senior Vice President Eric Adams. There Hastings wrote:

> On Saturday, August 15, 2015, Krystal Brakeman came to my desk sometime between 9:00 – 10:30 AM and showed me a picture on her cell phone. The content was of an arrest record for Amanda Mitchell.
>
> Krystal made the comment that an agent in CF had/has this information as well and would be holding it to use against Amanda if needed in the future.
>
> Comment was made, Krystal and Amanda are apparently from the same area "Baldwin County" and her maiden name sounded familiar. Apparently they were related (long distance) at some point. She mention [sic] her cousin (?) married someone in Amanda's family

(Doc. 21-16).

On August 20th, Adams drove from Compass's main office in Birmingham to the Decatur Call Center to talk to Mitchell about the mugshot. Edwards also participated in that conversation on speakerphone. (Edwards Dep. at 62-64). According to Edwards, Mitchell told them that the whole incident was a "misunderstanding" and the matter "was dropped" without her being "formally

charged" and that there was "nothing on her criminal record." (Id. at 64). When asked at her deposition whether those statements by Mitchell were truthful, Edwards replied, "Yes." (*Id*. at 65). However, Edwards could not recall whether she had done anything to verify Mitchell's account. (*Id*.) Indeed, any such statements by Mitchell to the effect that she was not prosecuted would have been clearly false: whether arising from a misunderstanding or otherwise, Mitchell's arrest resulted in her pleading guilty in early 2010 to a violation of Ala. Code § 13A-9-13.1, negotiating a worthless instrument, a Class A misdemeanor conviction for which Mitchell was ordered to pay restitution. (Doc. 21-18).

The day after the meeting with Mitchell in Decatur, Adams sent an email to Edwards and Frye. (Doc. 21-17 at 6). There Adams advised: "Amanda is extremely upset over this situation, as I would expect. She feels she has been 'maliciously attacked' by the agent because of her firm management style. I wanted to make her feelings known …." (*Id*.) Adams's email also attached a written statement from Mitchell addressing her arrest. (Doc. 19-9 at 27). Mitchell there claimed she had inadvertently written a bad check at a Wal-Mart in Baldwin County in the early 2000s. She said she also believed the matter had been resolved at that time until she was stopped for a traffic offense some six years later in 2009 while visiting her hometown and discovered there was a warrant out for her arrest. Finally, Mitchell related that she had been booked, released immediately on bond,

and went to court two months later, at which time, she said, she "paid a bunch of money, and all is taken care of." (Doc. 19-9 at 27).

At this point, Plaintiff was ignorant of the fact that Hastings had been reporting to HR and management that Plaintiff's act of bringing the mugshot to Hastings's attention itself amounted to a threat to blackmail and harass Mitchell. Plaintiff was also unaware of any investigation or other action then being undertaken by the company, which Plaintiff thought unusual because, in her experience, she had seen that HR normally got involved in such matters within three days. (Pl. Dep. 181). With that period having passed, Plaintiff went back to Hastings. Plaintiff asked her, "Have you heard anything about the jailbird situation?" (*Id*. at 181-82). Hastings laughed and replied that she hadn't.

On August 27th, with nothing else significant having transpired in the interim on the mugshot investigation, Plaintiff called Hastings and said that she was having some medical issues and that her doctors were going to be running some tests. Plaintiff further related that her doctors had taken her off work until September 6th, and she requested FMLA leave through that date. On that score, Compass had approved Plaintiff to take intermittent FMLA leave each year between 2012 and 2015 for periodic episodes of depression, anxiety, and panic attacks. After Plaintiff's call, Hastings reviewed an attendance spreadsheet log she

kept for Plaintiff,[6] which prompted Hastings to write an email to HR.  Noting that

Plaintiff would be out until September 6th, Hastings quoted from a memo issued

on January 8, 2015, by Tasha Hardy, Compass's FMLA Coordinator, pre-

approving Plaintiff to take intermittent FMLA leave during that calendar year "to

attend [doctor's] appointments at least twice a year and for flare ups that may

occur 1 time every 3 months."  (*See* Doc. 21-7 at 3; Doc. 21-1 at 2).  Hastings then

observed that, according to her log, Plaintiff had, "on average," been "missing 3-4

days per month" on FMLA leave.  (Doc. 21-7 at 3).  Finally, Hastings asked

whether someone could "review [Plaintiff's] case and reach out to her if needed"

and whether she, Hastings, was supposed to code Plaintiff's pending leave as

"FMLA."  (*Id*.).

On September 1st, Hardy, who had been out of the office for several days,

replied to Hastings email.  (Doc. 21-7 at 2).  Hardy asked Hastings for further

details about Plaintiff's current leave and whether Plaintiff had said it was "due to

her FMLA reason."  (*Id*.)  Hastings responded with an email, copied to Edwards,

stating:

> Yes, she called 8/27 she stated per doctor she would not be back to
> work until 9/6 due to FMLA.

---

[6] It is not disputed that Hastings had a similar attendance log for each agent under her
supervision, not just for Plaintiff.

> Per her approved [leave of absence], this exceeds the amount of
> events she is covered and has been using more time than she is
> approved for.

(*Id.*)  Later on September 1st, Plaintiff provided a note from one of her doctors to

excuse her leave.  (Doc. 19-6 at 19-20).  The next day, Plaintiff also supplied an

updated FMLA certification form from another doctor.  (Doc. 21-2).  Ultimately,

Compass designated all days of Plaintiff's leave commencing on August 27th as

FMLA.  (*See* Doc. 21-8 at 3).

Plaintiff returned to work on September 8, 2015, the day after Labor Day.

That afternoon, Hastings called her into a meeting, whereupon they were joined on

speakerphone by Edwards, with whom Plaintiff had never previously spoken.

According to Plaintiff, Edwards immediately began questioning her about the

mugshot in a "very aggressive" manner.  Following the interview, Edwards

documented her recollection of what was said in an email to Frey, Alderson, and

Adams, as follows:

> I spoke with Krystal with her manager Summer.  I asked how did she
> become aware of [Amanda Mitchell's mugshot photo] and she stated
> that she has heard people discussing it in the breakroom, in the
> hallways, parking lots and in the smoking area.  She could not recall
> the names of the employees but recalled that she had a glance of a
> coworkers [sic] phone and a picture then took it upon herself to look
> it up.  I asked by what name did she look it up and she said that she
> did not remember, but she looked it up solely to bring to managers
> [sic] attention of what was going on on the floor and between team
> members.  Chain of Command- I asked again was apart [sic] of the
> conversations?  She said I speak to everyone, I don't know everyones
> [sic] names.  I said are you or have you ever been related to Amanda

by blood or marriage?  No, not that I am aware of? [sic]  I asked again what name did she use to look the information up?  She said not Mitchell but Finley?  How did she know to use that name?  She must have heard that in the conversations.  I asked her if she recalled telling Summer, her manager that she and Amanda were related by marriage distant cousin [sic]?  No, I asked has she shown or shared the information and the photo with any other BBVA employee?  No.  I asked her if she recalled making the statement to Summer who was walking out of a meeting with Amanda "You been with the Jail Bird, jail mate or in mate [sic]?  Summer seemed puzzled and said what who, Amanda you have been with Amanda right?  Summer said I have been in a meeting with Amanda and by the way what is that website again that you showed me and you walked summer through the internet to get to this particular website, a website you do not recall today.  I asked her if she recalled making the statement to Summer, "We put two and two together and we said if Amanda keeps pushing us we will use this against her."  She said I can not [sic] recall word for word what I said to Summer it has been several weeks and you are making me feel defensive.

I again asked for the names of co workers [sic] that has [sic] been in discussion about Amanda and she said I don't know.  I then stated that we have a zero tolerance for harassment at BBVA and right now all that I have is information that she is the person with the information on her phone and that she made statements to Summer her manager and now she is not being forth right [sic] with the details and will have to place her on PAID Admin[istrative] leave until the investigation … is complete.  I instructed Krystal to send me an email by the close of business tomorrow with a recap of her memory details regarding the interview we had today.

I spoke with Michael Frye and reviewed my interview and told him that Krystal is on PAID Admin[istrative] leave until the investigation is complete.  He supported and will wait to hear from me.  I also left [a] message for Eric Adams to call me so I could update him as well.

I asked Summer to send me a recap as well, she mentioned that Krystal stated during the interview are you going to fire me if so go ahead and get it over with.

16

(Doc. 21-19 at 8-9).

According to Edwards, upon interviewing Plaintiff, she believed Plaintiff had been less than honest and forthcoming. (*See* Edwards Dep. at 106-13). In particular, Edwards cites that Plaintiff had at first claimed not to recall either that she had said in her initial conversation with Hastings about the mugshot that she, Plaintiff, might be distantly related to Mitchell or that she had referred to Mitchell as a "jailbird" in a later exchange with Hastings. In each case, Edwards says, Plaintiff was "called out" by Hastings whereupon Plaintiff then admitted having made such remarks. (*Id*. at 107-08). Edwards says she also felt Plaintiff was withholding information because Plaintiff said she did not know the names of any of the employees she said she heard talking about the mugshot, which Edwards thought unlikely. In addition, Edwards says that Hastings had reported that, in the meeting where she first brought the mugshot to her attention, Plaintiff had stated, "We put two and two together and we said if Amanda keeps pushing us we will use this against her." (*Id*. at 112). That suggested to Edwards, she says, that Plaintiff was part of the group of employees contemplating use the mugshot to harass and blackmail Mitchell. Edwards then asked Plaintiff in the interview whether she had made such a statement, but Plaintiff ultimately failed to clearly deny it, responding, rather, that she could not recall "word for word" what she might have said to Hastings. (*Id*. at 113).

The next morning, September 9th, Edwards received a follow-up email from

Plaintiff, which stated as follows:

This is my official statement regarding our previous call:

About three weeks ago I overheard a few CF agents talking amongst
themselves close [to] the collections department door by my desk
talking about a manager, Amanda being arrested. Later on that day on
a break, I passed some of the same agents chatting in the hallway
close to the break room about the same information stating for them to
look at Mugshotsearch.org and Amanda's previous last name was
Findley. I did see a picture briefly on one of the phones that was
being passed around. I do not know these agents personally to know
their names. I continued into the breakroom to get something to drink
and I could still hear them chatting stating if Amanda made them mad
again, they would use this information against her.

During my next break, I was talking to Chasity that works in CF. She
asked me if I have heard anything about it and she showed me the
arrest record on her phone. I tried to laugh off the subject and change
it and that was all I can recall that was said. I remember returning
from that break and I pulled up the information on my phone to verify
it was legitimate. I knew I definitely needed to report this issue.
Later on when Summer was available and didn't have any employees
at her desk. I remember walking to her desk and telling her what I
heard and [had] seen. I told her what was being said about Amanda
and I showed her the website on my phone. I told Summer that
Amanda and I could have possibly been related by a previous
marriage of my deceased Aunt, but I am not positive. I also told her
about what was said by the agents saying they wanted to use this
information against Amanda. I also remember telling Summer it
would be horrible if someone would try to do that. I did not say that I
was trying to do such things. I was reporting what I heard because
she asked me to let her know if I hear anything on the floor due to a
recent incident in our group. Summer verbally asked me to send her
the link to the website it was on so she could see it a few hours later. I
sent the link to her as she requested assuming she was asking for it for
a report.

I think it was about a week later, Summer was returning to her desk from a meeting and I was attempting to ask her if anything was handled with the situation. But the only thing that nervously came out of my mouth was, "How is everything with Jailbird?" and I nervously laughed. I understand the statement I made was unprofessional of me. Summer said she didn't know anything. I don't recall the conversation about Amanda being discussed any further. I haven't heard anything about it again until yesterday, 9/8/15. This situation was not intended to offend and/or harass Amanda. I contacted Summer about it because she is my immediate manager and I did not want the situation to escalate. I do not know who originally found this information, only the sources I have listed in this statement.

I apologize for being upset on our call. This is just a shock for me and I was unable to collect my thoughts about the situation in whole. I just returned from a FMLA leave and was not expecting this on my first day back. If there is anything else needed or further instructions on me returning to work, please contact me through email or my cell phone ….

(Doc. 21-19 at 11-12).

After receiving Plaintiff's email statement, Edwards spoke with the agent identified therein, Chastity Terry. The next day, September 10th, Edwards obtained a written statement from Terry. (Doc. 21-19 at 13-14). Terry explained that she had originally seen Mitchell's mugshot at least eight months earlier when it was included on a text message from a former Compass employee she identified only as "Wendy." Terry acknowledged that she had later shared the mugshot with Plaintiff after they overheard some other employees discussing it on a smoke break and Plaintiff asked her about it. The next time she heard anything about it, Terry said, was when Plaintiff related that she had decided to show the mugshot to

Hastings, whereupon, according to Terry, Plaintiff had said that she had remarked, "I guess we have a jail bird working with us." (*Id*. at 13). Finally, Terry also related that, within the preceding month or two, Plaintiff had been "very upset" with Mitchell because Plaintiff felt that Mitchell had "addressed her unprofessionally" in connection with Mitchell's grading of one of Plaintiff's collection calls. (*Id*.) Edwards, in turn, took Terry's statements that she was also aware of Plaintiff's having referred to Mitchell as a "jailbird" and of the instance in which Plaintiff had been upset with Mitchell over a graded call as undercutting Plaintiff's claim that her motives in disclosing Mitchell's mugshot were benign.

After completing her investigation, Edwards had a conference call on or about September 11th to discuss her findings with Frye, Alderson, and Adams. At that time, Edwards stated that she believed that both Plaintiff and Terry had engaged in retaliatory and harassing conduct toward Mitchell by disclosing the mugshot and had been dishonest and evasive in the investigation. As a result, Edwards recommended Compass terminate both employees. Frye and Alderson concurred with and followed that recommendation. (Doc. 19-9 at 5-6).

On the morning of September 14, 2015, Adams presented both Plaintiff and Terry with their respective termination papers, a memo from Alderson and Adams, each of which cited "dishonesty and conduct unbecoming" as justifying the

discharge.  (Docs. 21-21, 21-22).  In relevant part, the memo to Plaintiff stated as

follows:

> **Per the BBVA Compass Employee Handbook, Section B-6 - B-7,**
> **Immediate termination:** *"Certain behavior, such as dishonesty,*
> *misuse of company property, or drug or alcohol abuse, calls for*
> *immediate termination of employment.  Examples of such behavior*
> *may include but are not limited to:  **Unbecoming conduct** that leads*
> *to loss of confidence or trust by the company's customers,*
> *shareholders, or regulators in the company's business practices,*
> *including business ethics violations, the appearance of impropriety, or*
> *illegal or unethical conduct."*

> Your performance in this area has become inexcusable as evident by
> the following:

> On August 15, 2015 you violated standards by engaging in conduct
> unbecoming by sharing a picture with malicious intent on your cell
> phone that contained information from an arrest record dated 2009 of
> another supervisor to your immediate supervisor.  When you  shared
> the picture to your supervisor you stated that another agent had/has
> this information as well and would be holding this against that
> supervisor if needed in the future.  You also provided that you and the
> supervisor were from the same area in "Baldwin County" and that her
> maiden name sounded familiar and that you were related at some
> point through distant relative.  On September 7, 2015 Human
> Resources conducted an investigation regarding the incident with you
> and your supervisor.  During the investigation you were asked how
> did you become aware of the incident and you stated that it involved
> multiple agents not just one.  You were then asked the names of the
> agents and you stated I do not know their names they were new agents
> on the Supervisors [sic] team.  When you provided your written
> statement you provided another agents [sic] name and she was the one
> that provided you the information however at the conclusion of the
> investigation you both named each other as the source of the
> information.  You denied making the statement of being a distant
> relative and making the statement of holding this against the
> supervisor however, when your supervisor recalled your conversation
> you then remembered making the statement of being a distant relative

and could not remember exactly what or how you delivered the message but it could have been taken the wrong way because you were upset with that Supervisor that day. The following day you made the comment to your supervisor that apparently we have a "Jailbird" working with us.

As a result of your dishonesty and conduct unbecoming your employment is terminated effective today, September 14, 2015.

(Doc. 21-21).

Following her termination, Plaintiff filed an administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After that proceeding concluded and Plaintiff received a right-to-sue notice, Plaintiff filed this action against Compass. In her Complaint, she raises claims alleging she was denied a promotion to the Team Lead position in violation of the respective anti-retaliation provisions of the FMLA and the ADA. (Compl. § V(A)). Plaintiff also brings a number of claims based on her discharge. First, she says it violated the FMLA, both because it amounted to interference with her right to take protected medical leave and because it was in retaliation for her exercise or attempted exercise of FMLA rights. (*Id*. §V(B)). Second, Plaintiff claims that her discharge violated the ADA, both because it constituted discrimination because of disabled status (*id*. § V(C)) and because it was retaliation for asking for reasonable accommodation of her disability. (*Id*. § V(B)). Third and finally, Plaintiff claims she was fired in violation of Title VII's anti-retaliation provision, because she

complained about Talmadge's statements, which Plaintiff considered harassment because of sex and religion. (*Id*. §V(D)).

With discovery complete, Compass filed its instant motion for summary judgment on all claims. (Doc. 17). Both sides have fully briefed their respective positions on motion. (Docs. 18, 20, 22). Each party has also filed an evidentiary submission. (Docs. 19, 21). The motion is thus ripe for decision.

## III.   DISCUSSION

Again, Plaintiff claims are based on two adverse employment actions: Compass's failure to promote her to the Team Lead position and her termination. She contends that the former action violated the FMLA and the ADA. She asserts that the latter action violated those same two statutes plus a third, Title VII. The court considers those claims in turn.

### A.   The Failure-to-Promote Claims

Plaintiff first contends that, by failing to promote her to Team Lead, Compass violated the FMLA and the ADA. (Compl., § V(A)). As to the former, she claims Compass unlawfully retaliated because she had taken or was anticipated to be taking intermittent medical leave protected by the FMLA. (Compl., ¶¶ 21, 23, 24). Plaintiff asserts that her request for FMLA leave also served as a request for a reasonable accommodation of a disability for purposes of the ADA, stemming from her depression, anxiety, and panic attacks. From there, Plaintiff advances an

ADA retaliation claim alleging that Compass denied her the promotion because of that request for accommodation. (*Id.* ¶ 22, 23, 24). Because these FMLA and ADA retaliation claims are closely related, the court will analyze them together. *See, e.g., Hill v. Branch Banking & Trust Co.*, 264 F. Supp. 3d 1247, 1265 (N.D. Ala. 2017).

The FMLA's central provision guarantees an eligible employee 12 weeks of unpaid leave in a one-year period because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86-87 (2002); *Cooper v. Fulton County, Ga.*, 458 F.3d 1282, 1285 (11th Cir. 2006); *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005). The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" substantive rights, 29 U.S.C. § 2615(a)(1), and violators are subject to consequential damages and appropriate equitable relief. 29 U.S.C. § 2617(a)(1). "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199,

1206 (11th Cir. 2001) (internal citations omitted); *see also* 29 U.S.C. § 2615(a)(1) & (2); *Hurlbert v. St. Mary's Health Care Syst., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1247 & n. 7 (11th Cir. 2015).

By regulation, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." 29 C.F.R. § 825.220(c). Even so, while the FMLA does provide an employee with a substantive right to be *restored* to the same or an equivalent position upon return from protected leave, 29 U.S.C. § 2614(a)(1); *see also Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236 (11th Cir. 2010), the Act does not contain an affirmative right to be *promoted* at any time. As such, Plaintiff's assertion that Compass denied her a promotion because she had taken or was anticipated to be taking further FMLA leave is a retaliation claim. *See, e.g., Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013); *Galloway v. GA Tech. Auth.*, 182 F. App'x 877, 881 (11th Cir. 2006).

> [T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. *King* [*v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). In other words, a plaintiff bringing a retaliation claim faces the … burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.*

*Strickland*, 239 F.3d at 1207.

Turning to the ADA, it prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). One way in which a qualified individual may be subjected to such unlawful discrimination is when her employer fails to reasonably accommodate her disability. 42 U.S.C. § 12112(b)(5)(A); *Holly v. Clairson Indust., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007). The ADA also contains an anti-retaliation provision stating that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Plaintiff's instant ADA claim relies on the retaliation provision. To establish such a claim, Plaintiff would have the burden at trial to prove that Compass intentionally retaliated against her by denying the promotion to Team Lead because she engaged in statutorily protected activity. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998). To that end, an objectively reasonable, good-faith request that the employer reasonably accommodate a disability may be protected activity supporting an ADA retaliation claim. *See id.* Further, asking for FMLA medical leave because of a condition

deemed to constitute a disability under the ADA may qualify as requesting a reasonable accommodation. *See Hein v. IMS Gear Holding, Inc.*, 2018 WL 1833254, at \*24 (N.D. Ga. Jan. 31, 2018); *see also Holly*, 492 F.3d at 1263 ("An employer must provide a modified or part-time schedule when required as a reasonable accommodation, absent undue hardship, even if it does not provide such schedules for other employees." (*quoting* EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2 EEOC Compl. Man. (CCH), § 902, No. 915.002 (Oct. 17, 2002), Question 22)); *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003) ("[A] leave of absence might be a reasonable accommodation in some cases").

An employee can establish a claim of FMLA or ADA retaliation using either direct or circumstantial evidence of the employer's unlawful intent. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270-71 (11th Cir. 2017); *Parker v. Economic Opportunity for Savannah-Chatham Cty. Area, Inc.*, 587 F. App'x 631, 633 (11th Cir. 2014). On that score, Plaintiff contends that she has direct evidence that Hastings made the decision to reject her for the Team Lead position because Hastings believed Plaintiff's depression, anxiety, and panic attacks would necessitate that she take intermittent medical leave under the FMLA. In support, Plaintiff relies on her own testimony recounting that, "as she was actually filling out the application" for the Team Lead position, Hastings told her,

"I know you're applying" and said that Plaintiff was "more than qualified" but that, "due to [her] medical [condition] and having to take time off from time to time for doctor's appointments and things, she needed someone that could be there all the time," and that, as a result, "she," that is, Hastings "would have to choose … another person." (Pl. Dep. 114, 157, 170).

"Direct evidence is evidence which, if believed, proves the existence of a fact without inference or presumption." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002). "So, direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n. 11 (11th Cir. 1998). The Eleventh Circuit, however, has marked "severe limits for the kind of language to be treated as direct evidence of discrimination." *Id.* "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (citations and quotation marks omitted). Further, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295

F.3d 1223, 1227-28 (11th Cir. 2002); *Kincaid v. Board of Trustees*, 188 F. App'x 810, 816 (11th Cir. 2006) ("When determining whether a statement is direct evidence of discrimination, we consider timing and whether the person making the statement was a decisionmaker.").

The court assumes that the statement Plaintiff attributes to Hastings[7] shows that Hastings considered Plaintiff unsuitable to fill the Team Lead position because Hastings anticipated that Plaintiff's medical condition would require her to take intermittent FMLA leave.[8]  The court will further assume that such a statement also implicates animus based on a protected request for accommodation of a disability under the ADA.  Nevertheless, Hastings statement is not direct evidence that Plaintiff was passed over for the promotion based on such considerations because the record establishes that, when the statement would have been made, other Compass managers had already selected the successful applicant and Plaintiff had yet to apply or otherwise express interest in the position.  To wit, another

---

[7] Compass mentions a number of times in its briefs that Hastings denies making the statement at issue.  At summary judgment, of course, the court must credit Plaintiff's testimony that Hastings did make the statement.

[8] The court notes that Hastings's statement would suggest that she had concerns specifically about Plaintiff missing work in the future because of her medical condition, not that Hastings resented Plaintiff for having previously taken FMLA leave.  However, "under the FMLA an employee need not be currently exercising her rights … to be protected from retaliation." *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1276 (11th Cir. 2012).  Thus, it is assumed that the FMLA would prohibit Compass from taking an adverse employment action against Plaintiff based on an assumption that she would need to take FMLA-qualifying leave in the future.  *Cf. id.* (holding that plaintiff could assert an FMLA retaliation claim based on allegations that her employer discharged her because she had applied to take FMLA leave to deliver a child).

Compass employee, LaTasha Clemons, applied on June 18, 2015; she was then interviewed on June 26th by two managers that did not include Hastings, namely, Sharp and Greer. Indeed, Hastings asked for the interview to be rescheduled because she was going to be off work that day, but that request was refused. Therefore, the interview went forward without her. Also on June 26th, Sharp sent an email to Edwards in HR stating, "We have interviewed Latasha Clemons and would like to extend the offer to her," an offer that Clemons ultimately accepted. There is no evidence that Hastings, then off work, was, in fact, involved in that interview or the actual decision to offer the job to Clemons. Further, when that decision was made, Plaintiff had yet to even apply. Rather, it was not until the next morning, on June 27th, that she submitted her application on Compass's online system. Plaintiff disputes none of this. And it was only then, according to Plaintiff, while she was filling out the application, that Hastings made the alleged statement about Plaintiff's medical condition and absenteeism. Plaintiff also makes no claim that she had previously expressed interest in the job even informally, that she was dissuaded or hindered from applying earlier, that or that Compass would itself determine to consider promoting employees for posted positions despite the fact that such employees had neither applied for nor otherwise expressed interest. *Cf. Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345-46 (11th Cir. 2003) (holding that to make out a prima facie case of discrimination

based on a failure be selected for a position, where the employer follows a formal application system with public postings, a plaintiff generally must show he actually applied for the position).

It is true, as Plaintiff emphasizes, that Hastings received emails from Edwards in HR in connection with the hiring process for the Team Lead opening, including one that solicited Hastings to provide "feedback" to HR on Clemons's candidacy. Hastings says, however, that she simply forwarded that email to Sharp for her to act on it. Hastings also admits that, in anticipation of the Clemons interview, she and Sharp had a conversation in which they agreed that Clemons made a good candidate for the Team Lead position, without discussing Plaintiff or any other possible candidates. Hastings denies any involvement in the hiring process otherwise. Plaintiff argues, however, that Hastings was formally listed as the "hiring manager" in the Compass online applicant tracking system and that Edwards at least initially confirmed in her deposition that Hastings had that status. Plaintiff says that such evidence, along with Plaintiff's testimony that Hastings said that "she" would be selecting someone else supports that Hastings was "the" or at least "a" decisionmaker for purposes of allowing her statement to be direct evidence of discrimination.

The court agrees that there is evidence tending to support that Hastings was listed in the Compass applicant tracking system as the hiring manager for the Team

Lead vacancy, although the copy of the document that Plaintiff claims to expressly reflect that does not legibly do so. (*See* Doc. 21-3 at 3). Nevertheless, Edwards initially confirmed in her deposition testimony that Hastings was the hiring manager. (Hastings Dep. at 32). While Edwards later claimed that such testimony was "incorrect" (*id*. at 50), she still acknowledged that the email sent from her account to Hastings to provide feedback on Clemons's application (*see* Doc. 21-4 at 3) was typically one that was forwarded to the person listed as the hiring manager on the online system. (*Id.* at 51-53; *see also id.* at 36-37).

Even if Hastings were so formally listed, however, the evidence establishes without dispute that Hastings was, in fact, absent from work on June 26, 2015, and thus did not attend when Sharp and Greer interviewed Clemons for the position. Indeed, as already discussed, Hastings's request that the interview be postponed so she could participate was denied. Moreover, a contemporaneous email chain indicates that those same two managers decided that same afternoon immediately following the interview to offer the job to Clemons, who ultimately accepted it. Thus, the evidence does not support that Hastings was actually a decisionmaker on the hiring.

Moreover, even assuming *arguendo* that Hastings's role in the selection process was greater than she lets on, the fact would still remain that her statement about Plaintiff's medical conditions and absenteeism would have come both (1)

after the decision to award the job to Clemons had already been made and (2) before Plaintiff applied or Compass had any reason to consider her as an actual candidate for the vacancy. Given that, any consideration by Hastings of Plaintiff's suitability for the position would have been a merely hypothetical, academic exercise, based on speculation that Plaintiff might later apply or only after Compass had resolved to offer the job to Clemons. Because a jury could not reasonably find that Hastings actually decided to reject Plaintiff before it was decided to offer the position to the successful applicant, Hastings's alleged statement is not direct evidence capable of defeating Compass's motion for summary judgment. *Cf. EEOC v. Audrain Health Care, Inc.*, 2013 WL 317311, *4-5 (E.D. Mo. Jan. 28, 2013) (holding that while supervisor's statement that she wanted to hire a woman for the job in question showed an unlawful bias, the evidence failed to establish a "direct link" between the remark and the plaintiff's rejection because the plaintiff never applied for the position, so the employer "never made a decision to deny [the plaintiff] the … vacancy"), *aff'd*, 756 F.3d 1083 (8th Cir. 2014); *Rollins v. Alabama Community Coll. Sys.*, 814 F. Supp. 2d 1250, 1265 (M.D. Ala. 2011) (supervisor's statement that he set the salary of successful male candidate at a level higher than posted in part because he thought "a male would be nice to have in the business office," was not direct evidence of sex discrimination as it might relate to claims by plaintiffs who had not applied for

the position); *McCollum v. Amtren, Inc.*, 2007 WL 896270, *8 (M.D. Ala. Mar. 22, 2007) (supervisor's statement "I would never put a woman out there," made in reference to the employer's "production area" was not direct evidence of sex discrimination where the plaintiff did not apply nor was rejected for a production level position); *Saharkhiz v. AMR Servs. Corp.*, 1998 WL 698943, at *6 (N.D. Ill. Oct. 5, 1998) (holding that, although a supervisor's statement that could be interpreted as asserting that the plaintiff was "too old for" a position and thus direct evidence of age discrimination, the statement did not create an inference that age was, in fact, "a decisive … factor in the contested employment decision because plaintiff never applied for the position in question."); *Marinich v. Peoples Gas Light & Coke Co.*, 45 F. App'x 539, 543-44 (7th Cir. 2002) (employer's vice president was not decisionmaker with respect to plaintiff's termination, and her comments reflecting unlawful bias did not constitute direct evidence where plaintiff's work group had not yet been transferred to vice president's division when alleged remarks were made, vice president was not involved in decision to terminate employee, and other managers had already decided to terminate employee if she did not report to the vice president as ordered).

A plaintiff can also use circumstantial evidence to prove a defendant's unlawful discriminatory intent. In such cases, courts typically employ the familiar burden-shifting framework first articulated by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), for use in Title VII cases. *See Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). The Eleventh Circuit has briefly summarized that three-step approach as follows:

> Under the *McDonnell Douglas* framework, a plaintiff must first create an inference of discrimination through her prima facie case. *Vessels* [*v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005)] "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Id.* "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." Id.

*Trask*, 822 F.3d at 1191. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The court notes, however, that Plaintiff does not actually assert that she has circumstantial evidence sufficient to make out a prima facie on these claims. Indeed, the court agrees she does not. Where a plaintiff claims that an employer unlawfully failed to hire or select her for a position, to establish a prima facie case under the *McDonnell Douglas* analysis, among the elements that she must generally prove are that she applied for an available

position, that she was thereafter rejected, and that after her rejection the position remained open and the employer continued to seek applicants. *See McDonnell Douglas*, 411 U.S. at 802; *Wall v. Trust Co. of Ga.*, 946 F.2d 805, 809 (11th Cir. 1991). Where, as here, the employer uses a formal posting and application system, the plaintiff's prima facie case must generally include proof that she actually applied for the job. *Smith*, 352 F.3d at 1345-46. There is no question that Compass posted the Team Lead vacancy and that Plaintiff submitted an application. As already discussed, however, the evidence is also undisputed that by the time Plaintiff applied on the morning of June 27, 2015, Compass had already decided the day before to offer the job to Clemons, who later accepted it. Therefore, Plaintiff cannot show that she was actually rejected and that the position remained open thereafter. Because Plaintiff cannot establish a prima facie case of retaliation under either the FMLA or the ADA based on the failure to promote her, Compass is entitled to summary judgment on those claims.

**B.    The Termination Claims**

Plaintiff also asserts a host of claims based on her discharge. (Compl. §§ V(B)(C) & (D)). Specifically, she says her termination:

> (1) interfered with her right under the FMLA to take intermittent medical leave (id. ¶¶ 28, 31);

36

(2) constituted unlawful retaliation for exercising her right to take FMLA leave (id. ¶¶ 28, 30);

(3) was motivated by her disabled status, in violation of the ADA's substantive anti-discrimination provision (*id.* § V(C));

(4) was motivated by her request for a reasonable accommodation of her disability, in the form of asking for FMLA medical leave (id. ¶¶ 29, 30), in violation of the ADA's anti-retaliation provision; and

(5) violated Title VII's anti-retaliation provision, because she complained about alleged harassment because of sex and religion. (Compl. § V(D)).

The court considers the last claim first, alleging retaliatory discharge under Title VII.

### 1. Title VII Retaliation

In relevant part, Title VII's substantive anti-discrimination provision makes it an "unlawful employment practice" for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's … religion [or] sex." 42 U.S.C. § 2000e-2(a). Title VII also contains an anti-retaliation statute, which in relevant part makes it an "unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Plaintiff's Title VII claim relies on the latter statute, for she asserts that Compass fired her in retaliation for her complaint to Greer about Susan Talmadge's remarks that

Talmadge and other employees wanted to "talk to" Plaintiff "about Jesus" and "getting a man in her life." Plaintiff, who is in a same-sex marriage, considered such remarks to be harassment based on her sexual orientation and religion.

To establish this claim, Plaintiff would have the burden at trial to prove that Compass terminated her employment because she made a complaint protected under Title VII. *See Evans v. Books-A-Million*, 762 F.3d 1288, 1298 (11th Cir. 2014). Compass argues that it is entitled to summary judgment on this claim because (1) Plaintiff cannot show that her complaint about Talmadge's comments was protected under Title VII or (2) that, even if her complaint were protected, she cannot show Compass fired her because of it. As explained below, the court agrees with Compass that Plaintiff's complaint was not protected under Title VII. As such, the court need not consider whether the evidence supports that Plaintiff's complaint motivated Compass to discharge her.

Title VII's anti-retaliation statute may protect not only lawsuits filed in court and administrative complaints filed with the EEOC but also informal, written or verbal complaints of discrimination made internally to the plaintiff's employer. *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016); *Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989). Further, opposition to discrimination may be protected even though the underlying conduct of which the plaintiff complains does not actually violate Title VII. *See*

*Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.

1997). That being said, not all complaints opposing discrimination are protected.

Rather, a plaintiff must at a minimum

> show that she "had a good faith, reasonable belief that the employer
> was engaged in unlawful employment practices." *Little*[, 103 F.3d at
> 960]. This burden includes both a subjective and an objective
> component. *Id.* That is, the plaintiff must not only show that she
> subjectively (i.e., in good faith) believed the defendant was engaged
> in unlawful employment practices, but also that her "belief was
> *objectively* reasonable in light of the facts and record present." *Id.*
> (emphasis in original); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244
> (11th Cir. 2010). The objective reasonableness of her belief is
> measured by reference to controlling substantive law. *Butler v. Ala.
> Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

*Furcron*, 843 F.3d at 1311 (emphasis original).

Under the above standards, Plaintiff's complaint to Greer is not protected

activity for purposes of § 2000e-3(a) because Plaintiff could not have had an

objectively reasonable belief that Talmadge's comments amounted to an unlawful

employment practice under Title VII. First, while Talmadge's statements appear to

have been motivated by Plaintiff's homosexuality or same-sex marriage, under the

law of the Eleventh Circuit, Title VII's prohibition against discrimination "because

of … sex" does not reach adverse treatment motivated by sexual orientation.

*Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1255 (11th Cir.), *cert. denied*, 138

S. Ct. 557 (2017) (citing *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979)[9]).

While conceding that to be the law of the circuit, Plaintiff responds by emphasizing that *Evans* also reaffirmed that Title VII authorizes a cause of action based on discrimination motivated by a plaintiff's failure "to conform to a gender stereotype." 850 F.3d at 1254 (*citing Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011)). She also highlights that § 2000e-2(a) prohibits discrimination because of an employee's "religion." *See, e.g., Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1305 (11th Cir. 2002). From there, Plaintiff asserts that Talmadge's remarks condemned her "on the basis of her perceived failure to conform to Christian morals and traditional gender roles" (Compl. ¶ 42), thereby resulting, Plaintiff posits, in protection for her opposition to the remarks. The court disagrees.

First, to the extent that Plaintiff would characterize Talmadge's statements directed at her homosexuality or gay marriage as harassment motivated by Plaintiff's failure to conform to a female gender stereotype, the undersigned recently rejected an argument in another case based on what amounts to the same theory. In *Adams v. Jefferson Cty. Dep't of Health*, No. 2:17-cv-01772-JEO (N.D.

---

[9] The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Ala.), the plaintiff alleged that her employer had discriminated against her on the basis of both her homosexuality and her failure to conform to female gender stereotypes, which she asserted to include that she had a "female partner" and otherwise led a "lesbian lifestyle."  The undersigned explained that the plaintiff could not circumvent the Eleventh Circuit's ruling in *Evans* that sexual orientation is not protected under Title VII simply by re-casting her homosexuality or aspects of a "lifestyle" associated with it, including having a same-sex partner, as a failure to abide by "gender stereotypes":

> [U]nder the prevailing law in the Eleventh Circuit, Plaintiff's allegations that … employees of Defendant … exhibited disapproval of Plaintiff's "lesbian lifestyle," including that she had a "female partner," cannot be considered evidence of unlawful discriminatory intent based on "gender stereotyping."  In essence, Plaintiff is claiming that her "lifestyle" associated with being a "lesbian," including having a "female partner," amounts to a species of "gender non-conformity."  She would thus posit that mistreatment motivated by that "lifestyle" constitutes discrimination based on gender stereotyping in violation of Title VII.  Indeed, a number of courts have recognized that homosexuality may be viewed as an example, if not the epitome, of a failure to conform to "gender stereotypes," which would typically include sexual attraction to the opposite sex.  *See, e.g., Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 121 (2d Cir. 2018) (en banc) ("[S]tereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women. ... The gender stereotype at work here is that 'real' men should date women, and not other men," (quoting *Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002)); *Hively* [*v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 346 (7th Cir. 2017) (en banc)] ("Viewed through the lens of the gender non-conformity line of cases, Hively represents the ultimate case of failure to conform to the female stereotype …: she is not heterosexual."); *Winstead v. Lafayette Cty. Bd. of Cty. Comm'r's*, 197 F. Supp. 3d 1334, 1346 (N.D. Fla. 2016) ("[G]ay people, simply

by identifying themselves as gay, are violating the ultimate gender stereotype—heterosexual attraction." (quoting Anthony E. Varona & Jeffrey M. Monks, *En/Gendering Equality: Seeking Relief Under Title VII Against Employment Discrimination Based on Sexual Orientation*, 7 Wm. & Mary J. Women & L. 67, 84 (2000) (internal citations and quotations omitted)).

But that view does not hold sway in the Eleventh Circuit. Rather, our court of appeals has held the line that "a gender non-conformity claim is not just another way to claim discrimination based on sexual orientation, but instead constitutes a separate, distinct avenue for relief under Title VII." *Evans*, 850 F.3d at 1254-55 (internal quotation marks omitted). If one is to hew to that distinction, a plaintiff cannot "bootstrap" an invalid sexual orientation claim into a viable gender stereotyping claim by asserting that homosexuals fail to comply with gender stereotypes because of their homosexuality, real or perceived. *See Bostock v. Clayton Cty.*, 2016 WL 9753356, *7 (N.D. Ga. Nov. 3, 2016); *Bostick v. CBOCS, Inc.*, 2014 WL 3809169, *6 (M.D. Fla. Aug. 1, 2014); *Simonton v. Runyon*, 232 F.3d 33, 38 (2d Cir. 2000), *overruled by Zarda*, 883 F.3d 100; *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 763-64 (6th Cir. 2006). To hold otherwise "would mean that every case of sexual orientation discrimination would translate into a triable case of gender stereotyping." *Bostock*, 2016 WL 9753356, at *7 (quoting *Bostick*, 2014 WL 3809169, at *6). As a result, Plaintiff's allegations that she was a victim of mistreatment motivated by her "lesbian lifestyle" and having a "female partner" still amount in the end to a claim of discrimination based on "sexual orientation," not "gender stereotyping," as those terms are used in *Evans*. *See Smith v. City of Pleasant Grove*, 2016 WL 5868510, *6 n.4 (N.D. Ala. Oct. 7, 2016) ("To the extent Smith also alleges discrimination based on his 'association' with his male partner, … this allegation is simply a recasting of his allegation of discrimination based on his sexual orientation.") (Ott, M.J.).

*Adams*, No. 2:17-cv-01772-JEO, Doc. 23, Mem. Op. & Order on Motion to

Dismiss, Slip op. at 17-19 (N.D. Ala. May 8, 2018). Based on the same reasoning,

Talmadge's remarks prompted by Plaintiff's homosexuality or same-sex marriage

cannot be construed as harassment based on gender stereotyping. Accordingly, Plaintiff's opposition to such remarks cannot be protected on that basis.

Likewise, because it is not disputed that Talmadge's remarks were motivated by her concern or disapproval of Plaintiff's homosexuality, that Talmadge's expression invoked her own Christian beliefs is insufficient to establish that she was harassing Plaintiff because of Plaintiff's religion within the meaning of Title VII. *See Burrows v. College of Central Fla.*, 2014 WL 7224533, at *3-4 (M.D. Fla. Dec. 17, 2014) ("To the extent Plaintiff's claim for religious discrimination is based solely on Defendant's alleged religious disapproval of her sexual orientation, Plaintiff has failed to allege a claim for religious discrimination."); *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 292-93 (3d Cir. 2009) (granting summary judgment for the employer on the plaintiff's Title VII claim alleging he was harassed for failing to conform to his employer's religious belief that homosexuality was "contrary to being a good Christian"; "Given Congress's repeated rejection of legislation that would have extended Title VII to cover sexual orientation ... we cannot except [plaintiff's] *de facto* invitation to hold that he was discriminated against 'because of religion' merely by virtue of his homosexuality."); *Pedreira v. Kentucky Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (holding that plaintiff terminated on account of her homosexuality failed to state a claim for religious discrimination under Title VII;

"To show that the termination was based on her religion, [the plaintiff] must show that it was the *religious* aspect of her [conduct] that motivated her employer's actions." (*quoting Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000) (emphasis in *Hall*)).

But even assuming that sexual orientation is a protected characteristic under § 2000e-2(a) or that mistreatment based on an employee's homosexual relationship or "lifestyle" could support a Title VII claim under a theory of gender-stereotyping or religious discrimination, Plaintiff's complaint about Talmadge would still not be protected. As the Supreme Court has explained, to constitute an unlawful employment practice under Title VII, harassment motivated by a protected trait must be

> "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.' " *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (*quoting Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (some internal quotation marks omitted)). *See also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) (Only harassing conduct that is "severe or pervasive" can produce a "constructive alteratio[n] in the terms or conditions of employment"); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"). Workplace conduct is not measured in isolation; instead, "whether an environment is sufficiently hostile or abusive" must be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. Boca Raton, supra*, at 787–788 (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

> Hence, "[a] recurring point in [our] opinions is that simple teasing,
> offhand comments, and isolated incidents (unless extremely serious)
> will not amount to discriminatory changes in the 'terms and
> conditions of employment.' " *Faragher v. Boca Raton, supra*, at 788
> (citation and internal quotation marks omitted).

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).

Under those standards, no reasonable person could have believed that

Talmadge's comments amounted to a violation of Title VII. Indeed, the question is

not even a close one. Talmadge was a co-worker with no supervisory authority

over Plaintiff. (Pl. Dep. at 208). The entirety of Plaintiff's complaint is that, over

"two or three days," Talmadge made remarks to the effect that she and some other

employees "wanted to talk to" Plaintiff "about Jesus" and "getting a man in her

life." (*Id.*) Plaintiff's testimony indicates that Talmadge made such remarks at

least twice but perhaps not even five times, with some directed to Plaintiff

personally and some being overheard by her while Talmadge was talking to other

employees at lunch. (*Id.* at 209-10). Plaintiff might have reasonably felt such

sentiments were rude, intrusive, and intolerant. However, there is no indication

that the remarks were made for the specific purpose of offending Plaintiff; that

they were in any way threatening; or that they continued after Plaintiff complained.

While perhaps something less than entirely benign, Talmadge's conduct was not at

all either severe or pervasive and did not approach the stuff of a hostile work

environment. *See Breeden*, 532 U.S. at 271; *Butler*, 536 F.3d at 1213-14; *Clover v.*

*Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also generally Faragher*, 524 U.S. at 788 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" (*quoting Oncale*, 523 U.S. at 80 )).  Compass is entitled to summary judgment on the Title VII claim.

### 2.    FMLA & ADA Discharge Claims

#### A.    FMLA Retaliation - ADA Discrimination - ADA Retaliation

Plaintiff claims that her termination also gives rise to both interference and retaliation claims under the FMLA and discrimination and retaliation claims under the ADA.  The FMLA retaliation claim and both of the ADA claims are closely related and are addressed together in this section.  The court does so because each of these claims requires a showing that the employer intentionally discriminated based on legally prohibited consideration or animus.[10]  In particular, the FMLA retaliation claim requires proof that Compass fired Plaintiff because she exercised or attempted to exercise rights under the FMLA.  *See Surtain*, 789 F.3d at 1247 & n. 7.  The ADA discrimination claim requires proof that Compass discharged Plaintiff based on disabled status, *see Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999), while retaliation under that statute involves

---

[10] By contrast, Plaintiff's FMLA interference claim does not depend on the employer's motivation; rather, the only issues on that claim are whether the employee was entitled to a benefit granted by the FMLA and whether the employer denied that benefit.  CITE.  Because the employer's motives are irrelevant to FMLA interference, that claim is addressed separately in the text.

establishing that Compass was motivated by Plaintiff's request for an accommodation of her disability, in the form of asking for intermittent medical leave. *See Standard*, 161 F.3d at 1328; *Hein*, 2018 WL 1833254, at *24.

These claims are also related to each other in that Plaintiff pursues them based on a "cat's paw" theory of liability. That is, Plaintiff surmises that Hastings, in an effort to get rid of Plaintiff because her medical conditions were causing her to miss work, falsely accused Plaintiff of saying that she intended personally to use the online mugshot to blackmail or harass Mitchell, thereby influencing Edwards to recommend, and Frye and Alderson to decide based on that recommendation, that Plaintiff be fired. Likewise, Compass defends all of these claims on the common grounds that Plaintiff allegedly cannot show that any of those involved in the termination decision, including Hastings, harbored an unlawful animus and that Plaintiff was lawfully fired because, after a thorough and independent investigation, Compass's decisionmakers honestly and reasonably determined that Plaintiff had engaged in misconduct and that she was not honest and forthright during the investigation.

Plaintiff seeks to prove these claims using circumstantial evidence, implicating the *McDonnell Douglas* framework. To establish a prima facie case on the ADA and FMLA retaliation claims, Plaintiff may present evidence (1) that she engaged in statutorily protected activity; (2) that she was discharged; and (3) that

there was a causal nexus between the two. *See Hill*, 264 F. Supp. 3d at 1265.

"The causation prong is construed broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Id.* (quoting *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). To establish a prima facie case on the ADA discrimination claim, she might present evidence (1) that she was disabled within the meaning of the act; (2) that she was a qualified individual; and (3) that she was terminated because of her disability. *Javela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015).

The court will assume without deciding that Plaintiff can make out a prima facie case on each of these claims and thus will proceed directly to the second step of the *McDonnell Douglas* analysis. *See, e.g., Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995). At that point, Compass must produce evidence that it terminated Plaintiff's employment for one or more lawful reasons. *Id.* Compass has met that light burden. That is, Compass has referred the court to ample deposition testimony and documentary evidence that Edwards made a recommendation, adopted by Alderson and Frye, that Plaintiff be fired for showing Mitchell's mugshot to Hastings for an improper, harassing purpose, and for failing to be honest and forthright in answering questions during Edwards's investigation.

Therefore, these claims come down to the third and final stage of *McDonnell Douglas*, at which Plaintiff must proffer evidence that would be sufficient to permit the trier of fact to infer that Compass's proffered explanation for her discharge is a pretext to hide unlawful discrimination. "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "[A] plaintiff's prima facie case, combined with sufficient evidence that the [defendant's] asserted justification is false, may permit the trier of fact to conclude that the [defendant] unlawfully discriminated." *Reeves*, 530 U.S. at 148. "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson*, 376 F.3d at 1088. In reviewing a summary judgment motion, "'the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

Plaintiff does not contend that there is sufficient evidence of pretext to establish that either Edwards, who recommended that Plaintiff be fired, or Frye and Alderson, who made the ultimate discharge decision based on that recommendation, were motivated by Plaintiff's disabled status or activity protected by the ADA or FMLA. Plaintiff's argument, rather, is that it was Hastings who acted out of such unlawful motives and then used Edwards and the others involved in the decision as her cat's paw. That is, Plaintiff asserts that, to get rid of Plaintiff because of her absenteeism related to her medical leave, Hastings made knowingly false reports that accused Plaintiff personally of seeking to use the mugshot photo against Mitchell, when Plaintiff insists that she instead told Hastings only that she heard *other employees* contemplating such blackmail.

"'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013). Prior to the Supreme Court's decision in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)), Eleventh Circuit precedent had generally sanctioned cat's paw liability but had held that where the decisionmaker conducted his own "independent investigation" of the plaintiff's situation and did not simply "rubber stamp" the biased subordinate's accusation or recommendation, such would generally sever the causal link between the subordinate's unlawful

animus and the adverse action taken against the plaintiff.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1248-49 (11th Cir. 1998).

In *Staub*, the Supreme Court considered the operation of cat's paw liability relative to a claim under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), which provides in part that an employer "shall not'" deny employment or any benefit of employment "on the basis of" a person's membership in, or obligation to perform, military service.  38 U.S.C. § 4311(a). The Court further noted that USERRA was "very similar" to Title VII in that both statutes provide that an employer's liability for discrimination is established if the plaintiff can establish that the prohibited characteristic was "a motivating factor" in taking the adverse action unless the employer can prove that it would have made the same decision in the absence of its consideration of the protected trait.  *Staub*, 562 U.S. at 416-17 (*quoting* 38 U.S.C. § 4311(c) and 42 U.S.C. § 2000e-2(m)).  In that context, the Supreme Court rejected the employer's invitation to adopt "a hard-and-fast rule" that an "independent investigation (and rejection) of the [plaintiff] employee's allegations of discriminatory animus" by the decisionmaker will necessarily "suffice to negate the effect of the prior discrimination."  *Id.* at 420.  The Court explained:

[T]he requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-458 (2006); *Sosa [v. Alvarez-Machain*, 542 U.S. 692, 703 (2004)]. Thus, if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action (by the terms of USERRA it is the employer's burden to establish that), then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of "fault." The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.

\* \* \* \*

We … hold that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA.

*Staub*, 562 U.S. at 420-22 21 (emphasis original) (footnotes omitted).

However, almost two years later, the Eleventh Circuit decided *Sims*, which limited the applicability of the Supreme Court's analysis of cat's paw liability as set forth in *Staub*. In *Sims*, the plaintiff brought a claim alleging that, his reduction-in-force ("RIF") termination was because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. 704 F.3d at 1329. In one of his arguments, the plaintiff raised a cat's paw theory,

claiming that the formal decisionmaker was influenced by the recommendation of a supervisor who allegedly was biased against the plaintiff because of his age. The plaintiff further argued that *Staub* "modifie[d]" Eleventh Circuit cat's paw precedents so as to "lower[ ] the burden for plaintiffs in cases involving the ADEA." *Id.* at 1335. In addressing that argument, the court read *Staub* as holding that, under USERRA, "the employer could be liable [in a cat's paw case] only if the subordinate supervisor (1) performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action." *Id.* (citing *Staub*, 562 U.S. at 422). The court then explained that it understood *Staub* as recognizing that USERRA's "'motivating factor' causation standard is simply the traditional tort law standard of proximate cause, requiring only 'some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect.'" *Id.* (*quoting Staub*, 562 U.S. at 419 (internal quotation marks omitted)). The Eleventh Circuit emphasized, however, that unlike USERRA, with its "a motivating factor" standard of liability, the ADEA requires a plaintiff to prove that the employer's consideration of his age was the "but for" cause of the complained-of adverse action. *Id.* (*citing Gross v. FBL Fin. Services., Inc.*, 557 U.S. 167, 176 (2009)). That "but-for" standard, the court recognized, "requires a closer link than merely proximate causation; it

requires that the proscribed animus have a determinative influence on the employer's adverse decision." *Sims*, 704 F.3d at 1335-36 (*citing Gross*, 557 U.S. at 176). Following the Tenth Circuit's decision in *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949-50 (10th Cir. 2011), the Eleventh Circuit then held that *Staub*'s "proximate cause" standard does not apply to claims under the ADEA. *Sims*, 704 F.3d at 1336.

Compass maintains that all of these termination claims under the FMLA and ADA require proof of "but-for" causation (Doc. 18 at 2, 19 n. 11, 24), and Plaintiff concedes the point. (Doc. 20 at 25-26). Therefore, the court will assume that standard of liability applies to all of these claims. *See also Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (ADA retaliation subject to "but for" standard of causation); *Jones v. Allstate Ins. Co.*, 281 F. Supp. 3d 1211 (N.D. Ala. 2016) (Acker, J.) (same, as to FMLA retaliation); *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 236 (4th Cir. 2016) (ADA discrimination claim subject to "but for" standard). As a result, the Eleventh Circuit's holding in *Sims* means that *Staub*'s analysis of cat's paw liability does not apply to these claims insofar as *Sims* reads *Staub* as applying a traditional tort-law standard of "proximate cause" instead of what *Sims* says is a stricter "but for" standard. [11]

---

[11] Ironically, while the Eleventh Circuit stated in *Sims* that a "but-for" standard imposes a *higher* burden for a plaintiff to prove causation than does a traditional "proximate cause" standard, the Eleventh Circuit recognized that the opposite is true in a case decided the year before involving FMLA retaliation. *See Schaaf*, 602 F.3d at 1242-41.

However, this court does not interpret *Sims* to clearly resolve the specific question of whether, for cat's paw claims subject to a "but for" standard of liability, Eleventh Circuit precedent, recognizing that a decisionmaker's independent investigation situation generally purges the taint of discrimination associated with a biased supervisor's recommendation or accusation, survives *Staub*'s rejection of a "hard-and-fast" rule to that effect in cases employing the lesser "a motiving factor" standard. How that question is answered is potentially important here. Again, Plaintiff's present claims are assumed to be governed by a "but for" standard, like the claim in *Sims*, and Plaintiff acknowledges there is no evidence that Edwards, Frye, or Alderson were moved by unlawful animus. Plaintiff also does not seriously dispute that Edwards conducted an independent investigation, which included interviewing Plaintiff and other witnesses before making her recommendation that Plaintiff and Terry be fired; Edwards clearly did not simply take Hastings's word for it, false or not, that Plaintiff had herself expressed a willingness to use the mugshot against Mitchell. And it is at least arguable that *Sims* implies that the Eleventh Circuit's pre-*Staub* precedents, including *Stimpson* and *Llampallas,* recognizing that an "independent investigation" by the neutral decisionmaker generally breaks the causal chain and insulates the employer from liability still apply to cat's paw claims subject to "but for" causation. *Cf. Duncan v. Alabama*, No. 17-12406, ___ F. App'x ___, ___,

2018 WL 2126698, at *2 (11th Cir. May 9, 2018) ("Because *Staub* considered the cat's paw theory in the context of USERRA, it did not directly overrule precedent applying the theory in the context of other statutes." (*citing Sims*, 704 F.3d at 1335-36)).  If that is so, then Edwards's independent investigation would itself entitle Compass to summary judgment on these claims.

Even if *Staub*'s rejection of "a hard-and-fast rule" that an independent investigation will necessarily negate the effect of a biased supervisor's recommendation, however, the court concludes that Compass is still due to prevail as a matter of law on these claims.  For starters the evidence is weak that Hastings so resented Plaintiff because of her medical condition or her associated leave such that Hastings was looking to get Plaintiff fired.[12]  Hastings's alleged statement to Plaintiff while she was filling out an application for the Team Lead position in late June 2015, for example, tends to reflect that Hastings thought Plaintiff was a "qualified" employee but that she should not be *promoted* to a supervisory position due to her intermittent absences.  Likewise, Hastings's subsequent emails sent while Plaintiff asked for and received FMLA leave from late August to early September 2015 disclose a specific concern that Plaintiff was taking more FMLA leave than she was allowed under the terms of the annual leave pre-approval memo

---

[12] The court notes that there is also no evidence that Hastings made a statement suggesting any bias against Plaintiff because of her would-be Title VII complaint to Greer about Talmadge's remarks to the effect that Plaintiff needed to "find Jesus" and "get a man in her life."

drafted in January 2015 by Compass's FMLA coordinator, Walsh. Indeed, that appeared to be an accurate assessment by Hastings, even if the limited amount of leave pre-approved by that memo was more restrictive than that to which Plaintiff would have been actually entitled under the FMLA itself. In any case, Plaintiff makes no claim that she ever sought FMLA leave that was denied, by Hastings or anyone else with Compass.

Further, the Supreme Court indicated in *Staub* that a biased supervisor's report generally will not be a causal factor if an "independent investigation …. determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified." 562 U.S. at 421. Here, the evidence is that while Hastings allegedly made a false accusation of misconduct against Plaintiff, Hastings did not make a recommendation with respect to Plaintiff's termination *vel non*. Rather, it was the admittedly neutral Edwards who made the termination recommendation. And she made clear that she did not do so simply because Hastings had *reported* that Plaintiff had shown her the photo. Rather, Edwards explained that her recommendation was based principally on her belief formed as a result of what Plaintiff said and did *after* initially showing the photo to Hastings. In particular, Edwards highlights her belief that Plaintiff was dishonest and evasive during the investigation. In support, Edwards cited that Plaintiff had initially claimed not to recall in her conversations with Hastings either having called

Mitchell a "jailbird" or having suggested that she and Mitchell were distantly related, but Plaintiff then admitted making such statements when "called out" by Hastings during the interview. Plaintiff has not materially disputed that occurred. Likewise, Edwards asked Plaintiff specifically whether she had made the statement to Hastings, "We put two and two together and we said if Amanda keeps pushing us we will use this against her," which Edwards took as indicating that Plaintiff was herself part of the group of employees contemplating blackmail against Mitchell. Plaintiff broadly disavowed that she ever intended to harass Mitchell with the mugshot in any way. Plaintiff does not dispute, however, that she did not unambiguously deny to Edwards that she might have made the particular "we-put-two-and-two-together" statement to Hastings. Instead, Plaintiff deflected, saying merely that she could not recall "word for word" what she might have said. Edwards also referenced the fact that Plaintiff denied knowing the names of any of the other agents she says she overheard talking about using the mugshot against Mitchell, a claim that Edwards assessed as doubtful and suspicious. Finally, Edwards says she found, based on Terry's statement, that Plaintiff had recently had a disagreement with Mitchell over a call the latter graded, raising further questions about the purity of Plaintiff's motives in bringing the mugshot to Hastings.

The court would acknowledge that there is a significant chance that Edwards's assessments of Plaintiff's culpability and dishonesty were wrong on the

merits of things and that her termination, based on Edwards's resulting recommendation, was therefore "wrong" or "unfair" in some broad sense. Plaintiff strenuously insists that she never had a problem with Mitchell, that she never had any thought of using the mugshot to embarrass Mitchell, and that she only showed it to Hastings as her immediate supervisor because she thought management should be aware that other employees had been gossiping about it and had indicated they might use it for blackmail. If that's true, and it may be, this whole episode may be viewed as an example of the proverb "No good deed goes unpunished." However, a plaintiff cannot show pretext by simply arguing that she did not, in fact, engage in the misconduct of which she was accused by the employer. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). "Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (*quoting Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). The pretext analysis focuses upon whether the employer has given an honest account of its behavior or has instead used proffered lawful reasons as cover for discriminating against the plaintiff. *Alvarez*, 610 F.3d at 1266. As such, the "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's

head." *Id.* (citing *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997)).  And as the Eleventh Circuit has reiterated,

> [federal anti-discrimination statutes do] not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges.  We are not a "super-personnel department" assessing the prudence of routine employment decisions, "no matter how medieval," "high-handed," or "mistaken." *Alvarez*[, 610 F.3d at 1266] (quotation marks, citations, and alterations omitted).

*Flowers*, 803 F.3d at 1338.  In the end, the court concludes that Plaintiff has failed to present sufficient evidence of pretext or cat's paw liability, so Compass is entitled to summary judgment on Plaintiff's ADA discrimination, ADA retaliation, and FMLA retaliation claims based on her termination.

## B.     FMLA Interference

Unlike Plaintiff's ADA claims and her FMLA retaliation claim, her FMLA interference claim requires only a showing that she was entitled to leave or some benefit granted by the FMLA and that the employer denied that benefit; the employer's motive in denying the benefit is irrelevant.  *Strickland*, 239 F.3d at 1208.  Nonetheless, Plaintiff does not claim that she was ever denied FMLA leave, that she was on FMLA leave when terminated, or that she was denied restoration to her previous position upon returning from FMLA leave.  Rather, Plaintiff's interference claim is that her termination prevented her from taking intermittent FMLA leave to which she might have been entitled in the future.  However, if a

plaintiff is fired for a reason that does not involve the right to FMLA leave, that cuts off the plaintiff's right to FMLA benefits thereafter, thus defeating an interference claim premised on the alleged denial of such benefits. *See Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 831-32 (11th Cir. 2015). Accordingly, because Compass is entitled to summary judgment on Plaintiff's FMLA retaliation claim based on her discharge, Compass is also entitled to prevail on Plaintiff's associated FMLA interference claim.

## IV. CONCLUSION

Based on the foregoing, Compass's motion for summary judgment (Doc. 17) is due to be **GRANTED**. A separate final order will be entered.

**DATED** this 6th day of July, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge